AO 91 (Rev. 11/11) Criminal Complaint

**ORIGINAL**

# UNITED STATES DISTRICT COURT
for the

Central District of California

United States of America

v.

MARK CHAVEZ,
MATTHEW ICK, and
THOMAS OLAYVAR

Defendant(s)

Case No. 20MJ00690

LODGED

2020 FEB 12  AM 11: 54
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY ___

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of February 11, 2020, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1); 18 U.S.C. § 2(a) | Possession with Intent to Distribute a Controlled Substance; Aiding and Abetting |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Jonathan Ramirez, Postal Inspector
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2/12/20

_____
*Judge's signature*

City and state: Los Angeles, California

Hon. Charles F. Eick, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Jonathan Ramirez, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against MARK CHAVEZ ("CHAVEZ"), MATTHEW ICK ("ICK"), and THOMAS OLAYVAR ("OLAYVAR") for a violation of 21 U.S.C. § 841(a)(1); 18 U.S.C. § 2(a): Possession with Intent to Distribute a Controlled Substance; Aiding and Abetting.

2. The facts set forth in this affidavit are based upon my personal observations; my training and experience; and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.

### II. BACKGROUND OF AFFIANT

3. I am a Postal Inspector with the United States Postal Inspection Service ("USPIS") and have been so employed since June 2017. Prior to becoming a Postal Inspector, I served as a law enforcement officer with both the Orange County Sheriff's Department and the Pasadena Police Department for a total of approximately five years. As part of my training as a Postal Inspector, I completed a 12-week training course in Potomac, Maryland, which included training in the investigation of drug

trafficking using the mail. I am currently assigned to the USPIS Los Angeles Division, Prohibited Mail Narcotics Team. I was previously assigned to a Parcel Task Force, which was comprised of Postal Inspectors and Los Angeles Police Department ("LAPD") officers and detectives. The Parcel Task Force was responsible for investigating the trafficking of drugs through the United States Mail. I have also completed a 40-hour LAPD narcotics school training course. Since June 2017, I have participated in multiple investigations into violations of the Controlled Substances Act involving the United States Postal Service ("USPS") and discussed my investigations with other experienced law enforcement officers. For these reasons, I am familiar with how drug traffickers use the mail to facilitate their trafficking.

### III. BACKGROUND ON INSPECTION OF PARCELS AT THE BORDER

4. Based on my experience and training, and my conversations with fellow law enforcement officers, I know the following:

   a. Customs and Border Protection ("CBP") must first examine and admit international mail parcels and shipments that arrive in the United States before they are delivered to their destinations by a carrier, including the USPS. CBP officers are assigned to International Mail Facilities ("IMFs"). CBP officers conduct routine examinations of foreign mail service parcels at the IMFs as the parcels enter the United States before the parcels are prepared for delivery to their final destination. Due to the large volume of cargo that enters the

United States on a daily basis, CBP is unable to examine all parcels. CBP uses a variety of methods to select parcels for border search examination, including random and targeted inspections.

  b. Pursuant to their authority under Title 19, Code of Federal Regulations, Section 162.6 (also known as "Border Search Authority"), CBP officers and certain other law enforcement officers may conduct examinations of goods entering the United States without a search warrant, probable cause, or individualized suspicion.[1]

### IV. STATEMENT OF PROBABLE CAUSE

**A. Background of Investigation**

5. Since April 2019, the USPIS, along with the Federal Bureau of Investigation ("FBI"), Homeland Security Investigations ("HSI"), and other law enforcement agencies, has been investigating a dark web vendor (or vendors) of drugs. Law enforcement officers identified CHAVEZ, ICK, and OLAYVAR, along with RANE MELKOM ("MELKOM") and TERESA MCGRATH ("MCGRATH"), as members of a drug trafficking organization that uses the USPS to ship and receive drugs in connection with orders placed on the dark web. In connection with this investigation, on February 11, 2020, the Honorable Jacqueline Chooljian, United States

---

[1] From my conversations with the United States Attorney's Office, I am also aware of the following case law holding that searches at the border do not require probable cause or a warrant. United States v. Ramsey, 431 U.S. 606, 619 (1977); see also United States v. Cotterman, 709 F.3d 952 (9th Cir. 2013) (en banc) (holding that turning on, opening, and viewing contents of a digital device at the border while the passenger waited to enter the United States was reasonable even without particularlized suspicion.)

Magistrate Judge, authorized search warrants for the persons of CHAVEZ, ICK, OLAYVAR, MELKOM, and MCGRATH, as well as two residences. I am also making a separate affidavit in support of a criminal complaint against MELKOM and MCGRATH.

### B. OLAYVAR Mailed a Package Containing Methamphetamine

6. On or about August 28, 2019, pursuant to their Border Search Authority, CBP agents at an International Mail Facility inspected the contents of USPS Priority Mail Express International Parcel bearing USPS tracking number EH011372609US (the "09 parcel") destined for the Philippines that was found to contain approximately 533 gross grams of a crystalline-like substance that yielded a presumptive positive field test for the presence of methamphetamine. The return address on the 09 parcel listed an address that, according to internet queries, was listed for sale at the time of mailing.

7. Using USPS records and databases, I learned that the 09 parcel was first scanned at the United States Post Office in Alhambra, California on August 21, 2019. I reviewed surveillance video recordings from the post office and saw an unknown male, later identified as OLAYVAR, drop off the 09 parcel for mailing.

### C. Identification of OLAYVAR

8. On November 7, 2019, Homeland Security Investigations Special Agent Christopher Hicks provided an image of the male later identified as OLAYVAR taken from the post office surveillance video to a detective with the Burbank Police Department. Using Burbank Police Department facial recognition

4

software, the detective identified the male in the image as OLAYVAR.

9. I reviewed California Department of Motor Vehicle ("DMV") records for OLAYVAR and noticed that OLAYVAR's DMV photograph matched the person seen dropping off the parcels in the surveillance videos. I also reviewed social media accounts associated with OLAYVAR's name and noticed that the pictures of OLAYVAR matched the person seen in the surveillance videos.

10. Using law enforcement resources and public information databases, Special Agent Hicks identified telephone number 805-210-9858 as being associated with OLAYVAR. I searched USPS records and databases and learned that OLAYVAR opened a USPS account in his name on May 31, 2018, and provided that telephone number. I also noticed that the address associated with the USPS account matched OLAYVAR's address of record with the DMV.

### D. Laboratory Analysis Confirmed the Substance was Methamphetamine

11. On February 7, 2020, I learned that the U.S. Department of Justice Drug Enforcement Administration Southwest Laboratory completed chemical analysis and purity testing on the crystalline-like substance found in the 09 parcel. Laboratory analysis confirmed the substance to be d-Methamphetamine Hydrochloride with a net weight of approximately 501.1 grams and substance purity of approximately 99%.

### E. Packages Containing Narcotics from St. Louis

12. On November 13, 2019, CBP officers intercepted a Priority Mail International Package ("Subject Package 1") after

it entered into the International Service Center in Chicago, Illinois, pursuant to their Border Search Authority. CBP officers inspected the contents of the package and found metal canisters inside. Upon further inspection, the officers found approximately five kilograms of suspected 3,4-Methylenedioxy methamphetamine ("MDMA") concealed within the metal canisters. The officers conducted a presumptive field test of the substance that came back as positive for MDMA.

  13. USPIS Inspector Jordan Wicks reviewed the package and noticed that it was sent from "Noah Schulz, Falgerstrabe 239, Munster, Germany 48147" to "Johnathan England, 713 Briar Lane, Catawissa, MI 63015." Although the state abbreviation on the package's intended address was for the state of Michigan, further review determined it was actually in transit to an address in Missouri. A law enforcement review of public records associated with 713 Briar Lane, Catawissa, Missouri 63015 did not revealed an association between the name "Johnathan England" and that address.

  14. Inspector Wicks reviewed official USPS business records and related documents for Subject Package 1 and learned the USPS Letter Carrier scheduled to deliver Subject Package 1 was identified as D.F. Inspector Wicks reviewed recent delivery records for international packages that were delivered by D.F., which indicated she had not delivered the packages to the intended recipient, or to the destination addresses. Based on this information, Inspector Wicks contacted USPS Office of the Inspector General SA Anne Kriedt who confirmed his findings.

Based on Inspector Wicks's training and experience in conducting collusive USPS Letter Carrier investigations, he had reason to believe D.F. was in fact an intended recipient of Subject Package 1 and it would not even be delivered to 713 Briar Lane, Catawissa, Missouri 63015.[2]

15. On November 26, 2019, Homeland Security Investigations ("HSI") SA Jim Weber and Inspector Wicks approached D.F. while she conducted her routine mail delivery at a predetermined location in Franklin County, Missouri. They advised D.F. of her legal rights, which D.F. acknowledged. D.F. agreed to speak with the agents and admitted to providing addresses on her route where international drug packages could be mailed to an individual named B.B. D.F. would in turn obtain the packages at work and scan them as delivered. D.F. would then meet B.B. while on her route and give him the packages, which she knew to contain narcotics such as MDMA and ketamine. On at least one occasion, D.F. said she transported a package to B.B.'s residence after she was off duty. D.F. said she received financial compensation for the deliveries. Furthermore, D.F. admitted she was waiting for the package and knew it contained either MDMA or ketamine. D.F. said that three more international packages were in transit to her route and expected

---

[2] It should be noted, Inspector Wicks has conducted numerous investigations in which USPS Letter Carriers are not only involved in drug trafficking, but are often solicited by drug traffickers and criminal organizations to obtain drug packages in return for monetary gain or compensated in the form of narcotics.

to arrive by the end of the week, all of which she said contained MDMA or ketamine.

16. D.F. provided the agents with written consent to search her cellular telephone. During the search, D.F. identified a list of addresses on the device that she stated she provided B.B. to mail drug packages. When asked where the three inbound packages were in transit to, D.F. said she did not know and B.B. would inform her of the inbound addresses after the packages were already in transit. D.F. advised the reason she did not know which addresses the remaining three packages would be sent to was because she provided a large number of addresses to B.B.. B.B. would tell D.F. which addresses the packages were in transit to after they had been mailed.

17. D.F. contacted B.B. and told him she was in possession of the package. B.B. agreed to meet D.F. to retrieve the package. After B.B. arrived at the location D.F. provided and took custody of the package from D.F., agents arrested B.B.

18. Agents advised B.B. of his legal rights, which he acknowledged. B.B. agreed to speak with the agents and confirmed he purchased multiple pounds of methamphetamine from an unidentified dark web drug distributor over an approximate one year time period. In or around the fall of 2019, B.B. said the drug distributor contacted him through the Wickr application, which is an end-to-end encrypted application. According to B.B., the drug distributor advised he/she lived in California and his/her international drug shipments of MDMA and ketamine were being intercepted and seized. B.B. agreed to

receive international drug shipments in Missouri and immediately repackage them and mail them from Missouri to California, at an address provided by the drug distributor. According to B.B., he was paid over $2,000.00 per package and had accepted approximately three or four international drug packages since the fall of 2019, which he in turn mailed to the unidentified drug distributor in California. B.B. admitted that he knew the contents of the package was either MDMA or ketamine.

19. On November 26, 2019, B.B. contacted the drug distributor through the Wickr application, under the supervision of law enforcement agents, and confirmed he had received the package. The distributor advised B.B. to mail the package to an address he/she previously provided him, La Canada Mailboxes, P.O. Box 113, 2222 Foothill Blvd, La Canada, California (the "P.O. box"), and provided the tracking numbers to two other inbound drug shipments currently in transit to B.B.: tracking numbers CY519236126DE ("Subject Package 2") and CY522160277DE ("Subject Package 3").

20. On November 27, 2019, Inspector Wicks reviewed official USPS business records and confirmed Subject Package 2 and Subject Package 3 had arrived at the Villa Ridge Post Office, Franklin County, in the Eastern District of Missouri. Inspector Wicks further found that an international package with tracking number CY521054731DE ("Subject Package 4", and, collectively with Subject Packages 1, 2, and 3, the "Subject Packages") was also currently at the Villa Ridge Post Office. Task Force Officer Mason McNail responded to the Villa Ridge

9

Post Office, conducted a review of all three packages, and confirmed the Subject Packages all displayed similar characteristics.

21. At the request of the agents, Detective Jake Green, Jefferson County Sheriff's Department, responded to the Villa Ridge Post Office accompanied by his certified drug detection dog, Tank. Each of the Subject Packages was placed in a different area not known to be previously contaminated by a narcotic odor. Detective Green had Tank conduct a free air sniff of the area and confirmed Tank had a positive reaction, indicating the presence of a narcotic odor, when Tank searched the area of Subject Package 2, Subject Package 3, and Subject Package 4.

22. In order to mimic the originally planned shipment of the Subject Package, Inspector Wicks removed the narcotics from the packages and replaced them with packing peanuts and phone books, approximating the original weight of the packages. Inspector Wicks further emulated the shipping process by placing Priority Mail Express labels on the packages and shipping them out of a local post office to the P.O. box, as request by the drug distributor in California. Investigators then used B.B.'s Wickr application to send notification to the drug distributor in California that the Subject Packages had been shipped.

23. On or about December 3, 2019, the Honorable Michael R. Wilner, United States Magistrate Judge, Central District of California, authorized a warrant to search the digital devices in the possession of the individual who retrieved Subject

Package 1 from the P.O. box at La Canada Mailboxes in Case Number 2:19-MJ-05104.

**F.   Identification of ICK**

24.   On or about December 3, 2019, the date the Subject Packages were scheduled to be delivered, agents conducted surveillance of the P.O. box at La Canada Mailboxes.

25.   At approximately 4:07 P.M., Special Agent Hicks and I observed an individual later identified as ICK removing the Subject Packages from the P.O. box and loading them into a silver Mercedes vehicle.  The Mercedes had a California Department of Motor Vehicles ("DMV") Vehicle Moving Permit dated November 6, 2019 taped to the back window, which indicated that the Mercedes was registered to CHAVEZ, 561 E. Lee Street, Azusa, California 91702, and associated with the telephone number 424-310-8606 (the "Subject Telephone").

26.   Special Agent Hicks and I approached ICK and identified ourselves verbally.  I asked if ICK was Sam Peng, the listed recipient of the Subject Packages, and ICK responded "No".

27.   ICK told Special Agent Hicks and me that he was at La Canada Mailboxes to pick up the Subject Packages and deliver them to an address that he would not provide.  ICK said that an unnamed individual paid him $100 for this task.  When asked who paid ICK to pick up these packages, who the vehicle was registered to, and where he was going to deliver the packages, ICK responded "I was told not to tell you guys" and "I don't want to give him up."  Based on ICK's responses and demeanor, I

11

believe that ICK was aware of the intended contents of the Subject Packages and was lying to avoid arrest. ICK also stated that after leaving La Canada Mailboxes, he would be going straight to where he was originally planning to take the packages.

28. When ICK drove away from La Canada Mailboxes, an FBI surveillance team followed him and watched him park in the vicinity of the Alina apartment building at 700 W. 9th Street, Los Angeles, California 90015. FBI agents then watched ICK walk to the pedestrian entrance of the apartment building, where they lost sight of him.

29. FBI SA Christopher Siliciano later interviewed the property manager of the Alina apartment building. The property manager told SA Siliciano that the Alina staff frequently saw ICK and CHAVEZ together after being shown DMV driver's license images of ICK and CHAVEZ. The Property Manager also said that the staff believed ICK and CHAVEZ were drug dealers and frequently observed them carrying large boxes into the apartment building.

G. **Review of ICK's Phone**

30. Pursuant to the search warrant, Special Agent Hicks reviewed a Motorola cell phone found in ICK's possession that did not require a passcode. During his review of the phone, Special Agent Hicks found a recent message from the Subject Telephone providing the address of La Canada Mailboxes, asking for confirmation when ICK arrives, and stating that "there should be 4." This led investigators to believe that the

12

operator of the Subject Telephone was tracking the Subject Packages and directing ICK to retrieve the packages on his behalf.

31. I reviewed subscriber records for the Subject Telephone and observed that the name on the account was CHAVEZ.

32. Special Agent Hicks informed me that he also found the following information during his review of ICK's phone:

    a. On November 19, 2019, ICK received a text message from the Subject Telephone, a cell phone utilized by CHAVEZ stating, "Tell Thomas he has two loads." Based on my training and experience, I know that drug traffickers often use slang terms such as "load" to describe an amount of narcotics they have sold or received. In addition, based on my investigation in this case, I suspect that "Thomas" is OLAYVAR.

    b. On November 24, 2019, ICK received a message from the Subject Telephone stating, "Tell Thomas get box or bags something for the packages." Based on my training and experience, I know that drug traffickers frequently use boxes or bags to transport multiple packages containing drugs to the post office for delivery.

33. On November 29, 2019, ICK sent a text message to an individual listed in his phone as "Thomas", cell phone number 805-342-2935, stating, "Sup Thomas Mark wants to know the PO box." Based on my training and experience, I know that drug

traffickers use multiple different post office boxes to receive drug shipments, or send drugs to their customers.

### H. Search of CHAVEZ, ICK, and OLAYVAR's Residence

34. On February 10, 2020, the Honorable Jacqueline Chooljian, United States Magistrate Judge, authorized a warrant to search 222 S. Main Street, Apartment 1211, Los Angeles, California, (the "STOA apartment") in Case Number 2:20-MJ-00592. Based on this investigation, investigators believe the STOA apartment to be a three-bedroom apartment where CHAVEZ, ICK, and OLAYVAR reside.

35. On February 11, 2020, I, along with other law enforcement officers, searched the STOA apartment pursuant to the search warrant. CHAVEZ, ICK, and OLAYVAR were present in the STOA apartment at the time of the search. During the search, law enforcement officers found the following:

    a. In the master bedroom, believed to be occupied by CHAVEZ based on observations and identifying information in the room:

        i. Approximately 17,961 gross grams (39.5 pounds) of a crystalline-like substance that yielded a presumptive positive field test for the presence of methamphetamine; and

        ii. Two loaded handguns.

    b. In the bedrooms believed to be occupied by ICK and OLAYVAR based on observations and identifying information in the room:

         i. User-quantities of suspected methamphetamine.

      c. In the common areas of the STOA apartment:

         i. User-quantities of suspected methamphetamine; and

         ii. A heat-sealing machine.

         (I) Based on my background, training, experience, and investigation in this case, I know that heat-sealing machines are used by drug-traffickers to package drugs for mail deliveries.

36. In addition, during a search of OLAYVAR's person, law enforcement officers found a credit card in the name "Sam Peng," which matched the name of the listed recipient for the Subject Packages at the P.O. box at La Canada Mailboxes.

37. On February 11, 2020, law enforcements officers arrested CHAVEZ, ICK, and OLAYVAR for a violation of 21 U.S.C. § 841(a)(1) related to the drugs found during the search of the STOA apartment. CHAVEZ, ICK, and OLAYVAR are presently in custody.

///

///

## V. CONCLUSION

38. For all of the reasons described above, there is probable cause to believe that CHAVEZ, ICK, and OLAYVAR have committed a violation of 21 U.S.C. § 841(a)(1); 18 U.S.C. § 2(a): Possession with Intent to Distribute a Controlled Substance; Aiding and Abetting.

_____
JONATHAN RAMIREZ,
USPIS Postal Inspector

Subscribed to and sworn before me
this 12th day of February, 2019.

_____
HONORABLE CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE